## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **MARIANA ACOSTA,** <br> **KATHERINE PEREZ,** and <br> **MARLENY POLANCO,** individuals <br> residing in the Commonwealth <br> of Massachusetts, <br><br> **Plaintiffs** <br><br> v. <br><br> **INTER-COAST INTERNATIONAL** <br> **CAREER TRAINING, INC.,** a <br> California corporation previously <br> authorized to do business in the <br> State of Maine, <br><br> **GEETA B. BROWN,** an individual <br> residing in the State of California, <br><br> **and** <br><br> **CHRISTOPHER S. BROWN,** an <br> Individual residing in the <br> State of California, <br><br> **Defendants** | Case No. |

### PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Mariana Acosta, Katherine Perez, and Marleny Polanco ("Plaintiffs"), by and through undersigned counsel, hereby complain against Defendants as follows:

### INTRODUCTION

1.      This case alleges a $90 million fraudulent scheme on the part of Defendants, who scammed Plaintiffs (among many others) out of tuition payments for an illegitimate Maine-based practical nursing ("LPN") program under the fictitious name "InterCoast Career Institute" or

"InterCoast Colleges." Similar litigation has been brought against InterCoast by individual and proposed class action plaintiffs, although no class has been certified at this time due to pending arbitration (*see, e.g., Kourembanas et al. v. InterCoast Colleges d/b/a InterCoast Career Institute*, Case No. 2:17-cv-00331-JAW; *Mason v. InterCoast Career Institute*, Case No. 2:14-cv-00377-JAW; *Perez-Webber and Reynoso v. InterCoast Career Institute*, Case No. 2:16-cv-00196-JAW; and *Klar v. InterCoast Career Institute*, Case No. 2:17-cv-00388-JAW).

2.      The arbitrability of the instant case is doubtful because this Complaint alleges civil RICO violations and fraud against Geeta and Christopher Brown personally, as well as Inter-Coast International Training, Inc., which is not the entity listed on the enrollment agreement signed by Plaintiffs. The enrollment agreement signed by Plaintiffs refers only to "InterCoast Career Institute," a sham entity that was never authorized to do business in the State of Maine.

3.      Along with their company Inter-Coast International Training, Inc., Geeta and Christopher Brown are the individual conspirators responsible for the scam described herein, and the unauthorized "InterCoast" entity that carried on the fraudulent operations at issue on the Kittery and South Portland, Maine campuses, as well as multiple locations in California.

4.      In addition to civil RICO, Plaintiffs allege claims against Defendants for unfair and deceptive trade practices under Maine and Massachusetts law, fraud, negligent misrepresentation, and breach of contract.

## **THE PARTIES**

5.      Plaintiff Mariana Acosta resides in Lawrence, Massachusetts.

6.      Plaintiff Katherine Perez resides in Lawrence, Massachusetts.

7.      Plaintiff Marleny Polanco resides in Methuen, Massachusetts.

8.     Defendants Geeta Brown and/or Christopher Brown are the President, CEO and/or owners of Defendant Inter-Coast International Training, Inc. (hereinafter "ICIT"), a California-based corporation that was previously authorized to do business in the State of Maine.

9.     For years, ICIT has fraudulently conducted business under the fictitious name "InterCoast Career Institute" or "InterCoast Colleges." These sham InterCoast entities, which were never authorized to do business in the State of Maine, and never listed as an assumed or legal name for ICIT, are hereinafter collectively referred to as "ICCI."

10.    Defendant Geeta Brown ("Ms. Brown") is a resident of the County of Los Angeles and State of California.

11.    Defendant Christopher Brown ("Mr. Brown") is the executive director, CEO, and/or President of ICIT and the husband of Defendant Geeta Brown.

12.    Defendant Christopher Brown also resides in the County of Los Angeles and State of California.

13.    Each of the Plaintiffs enrolled in ICCI's LPN program at Defendant's Kittery, Maine campus in or about April 2014 with a program start date of May 27, 2014.

## JURISDICTION AND VENUE

14.    This Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because of the civil RICO claims alleged against Defendants.

15.    This Court has supplemental jurisdiction over the remaining claims advanced in this Complaint pursuant to 28 U.S.C. § 1331.

16.    In addition, this Court has jurisdiction over the matters alleged herein pursuant to 28 U.S.C. § 1332(d) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

17.     Prior to filing this Complaint, each Plaintiff entered into a tolling agreement with Defendants, which provided for the tolling of the statute of limitations for claims brought by each Plaintiff against Defendants arising from the fraud set forth herein, as well as the legally invalid releases signed by Plaintiffs that are discussed below.

18.     The above-mentioned tolling agreements were executed on August 9, 2019 and effective through November 9, 2019, at which time each agreement was continued.

19.     In August of 2019, Plaintiffs provided Defendants' legal counsel notice of the above-described cause of action, amounting to a demand for relief pursuant to the Maine Unfair Trade Practices Act, 5 M.R.S. § 213, as well as the Massachusetts Consumer Protection Act, Chapter 93A.

## FACTUAL BACKGROUND

### Geeta and Chris Brown's Fraudulent Scheme and Lack of Corporate Formalities

20.     In 1994, Defendant Christopher S. Brown executed and filed Articles of Incorporation in the State of California for Inter-Coast International Training, Inc. (hereinafter referred to as "ICIT").

21.     Mr. Brown listed himself as the registered agent for ICIT in the 1994 California filing.

22.     In 2009, ICIT sought authority to do business in the State of Maine. The application on file with the Maine Secretary of State lists Mr. and Mrs. Brown as the two officers/directors of ICIT.

23.     The 2009 application for authority to do business in the State of Maine did not list any fictitious name or d/b/a for ICIT, such as InterCoast Colleges or InterCoast Career Institute.

24.    From 2009 to 2015, the "home office" address for ICIT in California was a PO Box in Granada Hills.

25.    In 2015, ICIT filed a late annual report with the Maine Secretary of State.

26.    In 2016, ICIT failed to file an annual report with the Maine Secretary of State and its authorization to do business was revoked.

27.    The fictitious or assumed names "InterCoast Colleges" or "InterCoast Career Institute" do not appear anywhere in the Secretary of State's corporate records for ICIT and ICIT is no longer authorized to do business in the State of Maine.

28.    ICIT failed to file yearly information statements with the California Secretary of State between 1994 and 2017.

29.    Since its founding in 1994, ICIT has operated a private, fraudulent, for-profit postsecondary education program that purports to include degree and "certificate" programs including the LPN program in Maine.

30.    Aside from the LPN program in Maine, the majority of ICCI's scam postsecondary education programs are located in California.

31.    On LinkedIn, Mr. Brown is listed as the CEO of ICCI.

32.    On other documents, Mrs. Brown is listed as the CEO and/or President of ICCI.

**<u>Defendants' Fraudulent Scam to Churn Tuition and Pocket Federal Funds</u>**

33.    In 2009, the Maine Board of Nursing ("BON") partially approved ICCI's LPN program.

34.    Defendants set up two campuses for its fraudulent scam LPN program: one in Kittery, Maine and one in South Portland, Maine.

35.     On September 1, 2010, the BON granted ICCI full approval for its scam LPN program.

36.     By mid-2012, the BON had received numerous complaints about ICCI's LPN program.

37.     The BON investigated numerous concerns and complaints regarding ICCI's program and entered into a consent agreement with ICCI in March of 2013. The initial consent agreement required ICCI to obtain candidacy status and then accreditation of the LPN program by the National League for Nursing Accrediting Commission ("NLNAC"). The initial consent agreement contained other reporting and oversight requirements for ICCI.

38.     According to an amended consent agreement by and between the BON and ICCI, Defendants were notified on March 24, 2014 that its accreditation with NLNAC had been deferred due to the program's non-compliance.

39.     Defendants knew that ICCI's scam LPN program lacked accreditation or even candidacy for accreditation in Maine, yet they continued to advertise, recruit, and enroll students. Defendants falsely claimed that ICCI was an accredited LPN program that surpassed the competition and afforded a superior opportunity for career growth and job opportunities.

40.     Acting on instruction and directives from Defendants, recruiters for ICCI fraudulently guaranteed job placement and the quality of instruction as part of the LPN program on the Kittery campus.

41.     Defendants recruited Plaintiffs to attend ICCI knowing that the scam LPN program failed to live up to their promises and failed to offer a legitimate, accredited education.

42.     By and through the scam entity ICCI, Defendants targeted Plaintiffs as women of color, from financially disadvantaged backgrounds, for whom English was a second language.

43.     Upon information and belief, Defendants instructed staff, recruiters and representatives of ICCI to inform prospective students not to "worry" about accreditation if students asked questions.

44.     Defendants, by and through their fictitious entity ICCI, preyed upon women like Plaintiffs who were more likely to seek advancement through community college programs like the scam ICCI.

45.     Defendants' Maine-based LPN program was a fraudulent scheme to churn enrollment and make money off tuition, paid for predominantly by the United States Government, in exchange for providing essentially no educational advancement.

46.     Defendants specifically devised a fraudulent scheme to recruit students like Plaintiffs in Massachusetts, Rhode Island, and New Hampshire, who would be willing to travel to Maine for an opportunity to advance their careers.

47.     The Kittery campus of ICCI was comprised of 85% minority students, many of whom traveled from out of state to obtain the LPN degree.

48.     Defendants failed to provide Plaintiffs with the education, training, or facilities that it had advertised and promised, in direct violation of Maine BON requirements.

49.     In enrolling and profiting from students, including predominantly poor and minority students, Defendants disregarded whether students were able to pass rigorous entrance exams or were likely to be successful in the program. Instead, by and through the scam entity ICCI, Defendants administered fraudulently oversimplified entrance examinations that did not comport with students' ability to complete coursework or pass the National Council Licensing Examination for Practical Nurses exam ("NCLEX").

50.     As part of their scam, Defendants directed staff and recruiters to administer entrance exams to prospective students on the same day they signed up for the program. The exam took five minutes. Even if a prospective student failed the exam, Defendants had ICCI representatives direct them to retake the test repeatedly the same day, as many times as it took for them to pass and enroll for the program.

51.     Upon admission to Defendants' scam LPN program, students were responsible for the entire cost of the program, regardless of how many sessions they attended. The result led to many students being dismissed from the program because they were unable to maintain the minimum grade point average, due to poor instruction or, in many instances, the complete absence of faculty.

52.     Plaintiffs were not given the opportunity to visit the Kittery campus before signing up for the LPN program at a site located in Salem, New Hampshire, where they thought they would be taking classes.

53.     The fraudulent scam run by Defendants at the Kittery campus was outrageously lacking in adequate facilities, programming, or even the outward appearance of a post-secondary education. The program was housed in a building beside a strip mall that looked like an abandoned warehouse with disgusting, old carpet. The heat and air conditioning rarely worked. Classes were held in large, barren rooms with long tables and no supplies. The bathrooms were so filthy that human waste was often found not only in the toilets but on the floor. No soap was provided, and Defendants never bothered to have the building cleaned. Books ordered and paid for by students were not obtained for weeks after the program started. Syllabi/course work was absent. The internet typically did not work in the building, even though Plaintiffs were charged a

"technology fee." Instructors rarely showed up to teach, and even when they did, they simply had students read from books without any instruction whatsoever.

54.     By contrast, Defendant attempted to make its South Portland campus—where less than 5% of students were minorities—appear more legitimate.

55.     Defendants' discrimination against Plaintiffs and other similarly situated students on the basis of race violated many of the Federal lending laws that Defendants were obligated to follow while collecting millions of dollars from exploiting young, poor, minority students.

56.     Defendants failed to make clinical experiences available to Plaintiffs and did not prepare them to take the NCLEX.

57.     Between 2013 and 2015, more than 80% of national NCLEX exam students passed. By comparison, the pass rate was only 42% for ICCI students in 2015.

58.     Knowing that the program was not accredited and that it would not be able to meet the requirements of the consent agreement with the Maine BON or obtain accreditation, Defendants continued to enroll students in the Maine LPN program on a quarterly basis. Defendants made false claims about the ICCI program to make it more attractive than the competition because there were no wait lists, the entrance exams were fraudulently easy, and Defendants completed the financial aid paperwork for students.

59.     Defendants, by and through representatives of the scam entity ICCI, were directly involved in every step of the financial aid process, making it deceptively simple for students to quickly sign loan documents.

60.     Despite their utter failure to provide any legitimate education, Defendants received tuition payments and loan proceeds from Plaintiffs and many others pursuant to Title IV

of the Higher Education Act of 1965, including the Direct Loan Program, Stafford Loans, and the Pell Grant Program.

61.     Defendants "helped" Plaintiffs prepare financial aid paperwork to be submitted to the United States Department of Education to finance the roughly $36,000 cost of the LPN program in Maine.

62.     Defendants' tuition rate was significantly higher than comparable, accredited LPN programs in New England.

63.     Students like Plaintiffs applied for and received loans for their purportedly accredited LPN program run by Defendants, with proceeds received directly from the United States government.

64.     For-profit 2-year college degree programs like those purportedly offered by Defendants are known for historical financial abuses and fraud, causing low-income students to incur significant student loan debt without receiving the benefit of the degree program they were promised.

65.     Between 2011 and 2015, Defendants received $78 million in Federal Title IV funds pursuant to the Higher Education Act of 1965.

66.     Upon information and belief, based on the utter lack of legitimate programming, resources, or staffing, and the poor facilities maintained by ICCI in Maine and California, it is likely that the majority of the $78 million received by ICCI between 2011 and 2015 went directly into Defendants Geeta and Chris Brown's pockets.

67.     In an affidavit previously submitted to this Court in another case (2:17-cv-00331-JAW), Defendant Geeta Brown admitted that she was "personally aware of the steps necessary for a new student to obtain financial assistance from the State or Federal Government to attend

the Kittery Nursing School. I have also become personally involved in many aspects of the operation, management and supervision of InterCoast and the Kittery Nursing School, and, therefore, possessed a very strong understanding of how financial aid is processed." *See* ECF No. 23-5, PageID# 447, paragraph 8, in Case No. 2:17-cv-00331-JAW.

68.   ICCI has extremely low ratings and reviews on the Consumer Affairs website, some of which are copied below. In two reviews, Chris and Geeta Brown are mentioned directly as participating in the scheme to defraud students:

A.   Original review: April 2, 2020: I completed all the online courses required for my Associates Degree in September of this year. I was supposed to graduate in November but to this day, they have been giving me the run around in regards to placing me in facility for my externship. In November I was told that I had to unenroll because I had gone past the deadline, they reassured me that it was just a formality and they have been giving me the same story every time I inquire about my externship. It's always "We are waiting to hear from a particular site." Every contact that they assured me was interested in interviewing me for either has been a site over 40 miles from me, the other contacts never responded to my emails, or phone calls. I have been calling them weekly for updates. Nothing.

B.   Original review: Nov. 7, 2019: I only want to reach out in order to help save young lives, as my life has already been ruined by Intercoast College. Greta Brown, CEO, is liar and manipulator in chief. Money is all that matters to this school enterprise. Students, PLEASE question things if they seem suspicious. There are MANY lawsuits looming over them for their deceitful and fraudulent practices. Check and RECHECK the amount you owe your lender. The school loves to double charge, and innocent students end up owing about $25,000 instead of a proper $9,800 that was owed. Add to that the interest on such loans, and your life will be ruined. On top of it all, do not expect to get a job based on this education. The degree is worthless!

C.   Original review: Sept. 19, 2018: This school is a rip off. Prior to enrolling I spoke with Chris and informed him that I would be moving out of state within six months. The course I was interested in was 12 months. I asked if it would be a problem to be out of state. He assured me there wouldn't be an issue and that they "have students all over the country". Well now that I have moved and informed Diane she let me know that they are not licensed (or something like that) to teach outside of California but she said she would call me back after discussing with Chris who is now the VP. That was 2 months ago and I have yet to receive a return call.

D.   Original review: March 17, 2018: I've decided to leave this review to warn people about Intercoast's Online Substance Abuse program. If you're looking into this school

11

I'd urge you to reconsider. This is why. I took this school a couple years ago. I was drawn in by the fact it was online, and they would help me find a job after. There were also other things that were promised. Well... Let me start with saying it's a bunch of BS. They don't help you find a practicum or a job. Also I completed all the school work and graduated and the school never even gave me my certification.

E.  Original review: Aug. 25, 2016: I attended in Portland Maine. Program was challenging and despite a lot of administrative drama I successfully completed the program and took the boards in Maine passing on my first try. I am now interested in going for my RN and no one will accept my prior learning, so I will have to start from the beginning! I'm already working as a nurse! I will need to redo all of those classes, not the mention I spent 32k for the 15 month program... Buyer beware. I was foolish... The other schools had wait lists of at least a year, some 3... So shame on me. I'm told they are in hot water with Department of Education and closed up shop in California. No advancement for me.

F.  Original review: March 28, 2016: I went to Intercoast in South Portland, Maine. Started in September 2014 but never got to finish the class because none of the people that worked there helped me get an externship. So now Kelly the owner or whatever she is saying I owe a balance of 2 grand. I can't get my transcript unless my balance is paid off when technically I didn't get to finish and never got me an externship. This school is BS. Good thing this school is closing its campus.

G.  Original review: Aug. 28, 2015: Go to a college. This was the biggest mistake of my life. Caused me to be depressed. The director of the campus plays favorites and is never available. Her door always shut. I owe 30,000 for the LPN program that I was forced to test into 3rd term cause I was out too long and failed me cause I couldn't suction a patient. When I asked what I did wrong? No explanation. You just failed. After calling the scholars to appeal that was denied, so Now I owe tons of money. Refused to give transcript. Too much Crap to list. Stay away. DON'T SAY YOU WERE NOT WARNED.

H.  Original review: Aug. 23, 2015: The tests were inaccurate. The new alcohol teacher is illegally conducting counseling from the school, and staff partying with students and employees. The whole federal funding is being unprofessionally used. There is no quality education or staff who knows what they are doing.

I.  Original review: July 21, 2015: I am currently attending ICC in Orange County CA. I am enrolled in the HVAC program which is held at the Annex building in Anaheim CA. Recently I have made attempts to address my disappointment with this school. I have talked with the student advisor but nothing has been done as of now. I feel terrible in doing so but I believe that what this school does is unethical and straight out wrong. Their interest is only revenue. Our campus goes without materials, equipment, and on occasion, Instructors!

J.  Original review: April 27, 2015: This was the biggest mistake of my life. Why?
    Because I wanted to go to school for substance abuse counseling and this was the
    closest school to me. It popped up out of nowhere, and I had a friend working as a
    recruit. She talked it up, and I'm sure she has no clue what was in store for me. I had 1
    instructor the whole time, who was absolutely wonderful, but my director always
    changed. I had completed my program, and I was ecstatic. When I had signed up, I
    was told there would be help with job placement. Lo and behold, 6 months after my
    graduation, which I was NEVER aware about, I didn't have a job or even help
    FINDING a job. I also never received my certificate and now I'm stuck at a job I don't
    like because this school screwed me over. Please don't make the same mistake I did.

K.  Original review: April 27, 2015: I've had the same experience with this college. If
    you fail a test, they'll change your grade to an A to make them look good for their
    ratings. I finished the school months ago. No certificate, don't even know if I actually
    graduated. They say I did. Took them 5 mins to enroll me, now that I'm done they
    could care less. Anyone want to start a class action lawsuit, and how do you go about
    it? Email me at **.

L.  Original review: March 17, 2015: Worst schools you can go to. Whole class of 30
    were taken advantage of, lied to and used. I did the Lvn program, we had 20
    instructors that weren't worth a damn. Didn't have clinical sites. The instructors, about
    5 of them advised us to sue them.

M.  Original review: Oct. 22, 2014: Intercoast is a complete joke and a scam. I started last
    November while four months pregnant. I was told I can take a maternity leave and
    come back no problem, after having my daughter I came back for one mod then was
    told they have to drop me for one mod and I can come back no problem. Well that
    wasn't the case. I called 2 weeks in advance like I was told to set up an appointment
    to sign my paper I needed to come back. The staff was completely new and no one
    knew who I was and that I was dropped. They are now trying to charge me the $6000
    for not finishing the program when they dropped me completely by themselves. I feel
    so betrayed by this company and the lies they sell to people to get money. They
    should be shut down for good instead of expanding.

N.  Original review: May 21, 2014: When I signed up, (Fairfield, Ca campus) I wasn't too
    sure what I wanted to do career wise. I had already worked two years with mentally
    disabled adults in a facility and in home setting. I originally wanted to start the LVN
    program but was talked out of it and referred to the MA program because I "didn't
    have enough experience" and I "didn't know medical terminology". They told me to
    give the MA program a try and if I was within the top 3% of the class, then they
    would automatically grant me to the top of the list for the LVN program... no waiting
    list basically. Before my 30 day trial period was up, I went to the campus president to
    tell her I wanted to transfer to LVN. Again, she looked at me like I was dumb...and
    again talked me out of it, saying "if you are the bottom 6 people of the class, you will
    be dropped and have to repay over $30,000 in loans. They don't teach you what you

13

will need to already know. Like taking a blood pressure or medical terminology. Everyone in the LVN program already has much experience. You'll fall behind"

O. Original review: Jan. 17, 2014: This school is a joke. I started the MHRT program in January of 2012. I took the online program. After financial aid and student loans, there was still a balance with the school which I was fine with. Once beginning the program, I basically paid 15,000 for what to me seemed like sixth grade curriculum. The instructors never returned calls or emails, it took weeks to get grades on assignments. There was one excuse after another. Your instructor was out of town, someone else was covering and there was always a communication mix up. If you complained to the upper administration, your emails never were answered and it was always the same story for a year that they were making administration changes.

P. Original review: May 2, 2012: InterCoast Colleges preys on people and fill their heads with lies. Their main goal is convincing you to sign on the dotted line. All they care about is that you stay enrolled past the 6-week mark because after 6 weeks, you are responsible for paying the full tuition, which is just shy of $19,000. I was going to be a certified AOD counselor, in which I completed all my classroom studies. Halfway through my internship, I ran into some personal problems with my recovery. After taking a 30-day LOA, I decided that it would be unethical for me to finish.

69.     Upon information and belief, Mr. and Mrs. Brown also run a scam talent agency/entertainment company in California. Mr. and Mrs. Brown own or have owned Prestige Talent Agency, which has been sued for harassing, violent, and abusive treatment of female employees. Prestige Talent Agency is reviewed online to be a "scam" that takes money from hopeful actors up front, without providing successful talent management. Prestige is also referred to online by other entity names, which are owned by Mr. and Mrs. Brown, such as Diverse Entertainment Group (renamed CNC Entertainment Group according to the California Secretary of State).

70.     Because of the consent agreement and scrutiny by the Maine BON in or around 2013-2014, Defendants began threatening to expel students from the program and changed grades without reason or warning.

14

71.     Defendants also refused to make basic exam results, grades, and transcripts available to students. Geeta Brown and other administrators acting on her behalf refused to return phone calls from aggrieved students.

72.     Even for students who completed ICCI's scam LPN program, their certificates were worthless. Students who wished to enter a registered nursing program upon graduation were unable to do so because ICCI's program lacked the accreditation it had specifically promised.

73.     As a result, students who took on significant student loan debt received nothing in exchange, while Defendants pocketed many millions of dollars at their expense.

74.     Defendants induced students like Plaintiffs to take on student loan debt and attend ICCI's fraudulent program as part of a calculated scheme for Defendants to obtain and pocket federal Title IV funds. Defendants churned enrollment and signed up students for financial aid knowing that the students would receive nothing in return that would advance their career.

**Defendants' Ongoing Conspiracy to Defraud Plaintiffs and Accelerate Loan Payments**

75.     In April of 2014, Defendants enrolled Plaintiffs for the LPN program in Kittery. This was the same month that Defendants informed the Maine BON that it had not yet achieved accreditation or even candidacy status pursuant to the consent agreement.

76.     Plaintiffs were enrolled for the LPN program that began on May 27, 2014 with a projected graduation date of August 2015. Plaintiffs believed at the time of the enrollment that the LPN program was accredited.

77.     Each of the Plaintiffs incurred significant student loan debt to pay the approximately $36,000 tuition for the program.

78.     On August 13, 2014, Defendants entered into an amended consent agreement with the BON requiring ICCI to achieve candidacy status with the Accreditation Commission for Education in Nursing (ACEN) on or before January 31, 2015.

79.     In August of 2014, likely during the same trip to Maine that Geeta Brown took in order to meet with the BON on August 13th, Ms. Brown met with the entire student body of ICCI. Ms. Brown was emotional and pretended to be supportive. She reassured the students that ICCI would obtain accreditation and everything would be ok.

80.     After this meeting, Plaintiffs were confused and unclear about what was going on with the program. Ms. Brown made promises about obtaining accreditation but did not clearly explain what was happening with the BON or the school in general.

81.     In January of 2015, the scam entity ICCI achieved candidacy status with ACEN, meaning that the LPN program was eligible for initial accreditation by July 29, 2016 if certain conditions were met. Upon information and belief, the information provided by Defendants to obtain that candidacy status was false and misleading.

82.     In May of 2015, Defendants, closed the Kittery campus of ICCI because of the overwhelming number of complaints from students, poor facilities, and lack of faculty or legitimate programming at that location.

83.     On the day that Defendants announced the Kittery campus closure, Geeta Brown returned to meet with the student body for a second time. Her attitude during this second meeting was markedly less supportive. Ms. Brown informed students that they had two options: (1) transfer to the South Portland campus and finish out the LPN program there, or (2) quit the program. Ms. Brown was clear that students would be charged the full program tuition regardless of which option they chose. Students questioned how it was possible for ICCI to charge them for

classes they had not taken yet, especially when many of them had to travel over 4 hours per day to get to South Portland. Ms. Brown did not offer a solution or response. Instead, she required the students to sign paperwork stating that they agreed to transfer to the South Portland campus.

84.     After Defendants closed the Kittery campus of ICCI, Plaintiffs were forced to drive an even longer distance to South Portland to attend classes. In South Portland, the racial disparities were palpable. An administrator of the program, Doreen Hunt, commented that the reason so many Kittery students did not pass the NCLEX exam was because "they're always speaking Spanish."

85.     Defendants extended the graduation dates for Plaintiffs and in some instances required them to take an additional semester, at an additional cost, in order to graduate. Throughout this timeframe, Defendants knew that the LPN program would never be accredited and Plaintiffs' "certificates" would be worthless.

86.     In September of 2015, ICCI informed the Maine BON that it had decided to close the LPN program entirely.

87.     Meanwhile, Defendants extended graduation dates for students and failed to inform them that the program would never achieve accreditation.

88.     Plaintiffs' class had their graduation date extended from August to September 2015. Plaintiffs Mariana Acosta and Marleny Polanco both graduated from Defendants scam program in September 2015.

89.     Defendants informed Plaintiff Katherine Perez that she would not graduate from the program along with her class because of her grades. Ms. Perez had to write a letter to a program administrator, followed by a letter to Defendant Geeta Brown in May of 2015, appealing that decision. In the letters, Ms. Perez explained that the grading practices at ICCI

17

were unclear. Ms. Perez should have had no problem graduating because her overall grade point average was 86.90. Defendants never responded to Ms. Perez's questions about why she needed to repeat a semester.

90.     Knowing that the LPN program would never achieve legitimacy, Defendants nonetheless forced Ms. Perez to take out additional loans to repeat a semester. Ms. Perez ultimately graduated in February of 2016.

91.     Despite repeated requests, Defendants have not provided a copy of the student loan documents related to the financial aid obtained by each of the Plaintiffs. However, upon information and belief, each student loan was for a 36-month term.

92.     Plaintiffs' first loan payments were due approximately one month into beginning the LPN program and the final payments were due three years later, which would be sometime in 2017 for each Plaintiff.

93.     After Plaintiffs graduated, Defendants refused to release their transcripts and/or certificates of completion of the nursing program unless Plaintiffs accelerated payments on their student loans with a premature lump sum payment.

94.     Defendants, acting by and through ICCI staff such as Kelly Michaud ("Michaud"), made illegal demands for Plaintiffs to accelerate their note payments, in violation of the Federal and Maine Fair Debt Collection Practices Act, as well as in breach of the student loan documents/promissory note.

95.     Plaintiffs repeatedly requested that Defendants release their transcripts and certificates of completion, without which they could not sit for the NCLEX exam.

96.     Defendants refused to release Plaintiffs' transcripts and held the transcripts hostage until Plaintiffs made lump sum payments to Defendants to pay off the balance of their student loans.

97.     Each of the Plaintiffs received an email demanding that they accept an offer from Defendants, by and through their scam entity ICCI, to accelerate and settle their student loan debt, which Plaintiffs were required to accept the same day and make an immediate, accelerated tuition payment.

98.     Plaintiffs involuntarily accepted the fraudulent, illegal scam by Defendants to recoup tuition for a defunct program that failed to deliver a legitimate education. Shortly thereafter, Defendants required Plaintiffs to come to campus and sign a release.

99.     Two of the Plaintiffs went to campus together, but they were not allowed to be present in the same room when meeting with Michaud, the purported campus administrator.

100.     Because English was a second language for her, Ms. Polanco asked if she could have her friend join in the meeting with Michaud to discuss loan repayment.

101.     Michaud refused to let Ms. Polanco's friend accompany her during the meeting. Michaud presented Ms. Polanco with a release and demanded that she sign immediately if she wanted her transcripts, which she needed to sit for the NCLEX exam.

102.     Michaud knew that without a transcript or successfully passing the NCLEX exam, Ms. Polanco could not work as a nurse.

103.     Ms. Polanco asked if she could call an attorney to have the release reviewed before she signed anything. Michaud refused to allow Plaintiff any time to consider the release and said the offer was off the table if Ms. Polanco left the meeting without signing. Therefore,

under duress, Plaintiff involuntarily signed the document on February 11, 2016 without reviewing or understanding its terms.

104.    Plaintiffs Mariana Acosta and Katherine Perez were similarly defrauded into signing a release accelerating their loan payments in or around February 2016.

105.    Plaintiffs asked for copies of the release they signed, but Defendants refused to provide them for years.

106.    Defendants perpetuated this scheme of defrauding other students into paying off loans for their defunct program in order to receive school transcripts so they could sit for the NCLEX exam. Defendants took these steps to scam more money out of students who would never receive the benefit of their bargain. Defendants knew that ICCI would soon be out of business in Maine and less likely to recoup their illegally obtained money if they did not accelerate note payments.

107.    Defendants accelerated loan payments and demanded money from student while they were winding up the LPN program in the State of Maine. Defendants knew that, without accreditation, Plaintiffs and their classmates would not be able to enter a registered nursing program, and essentially the LPN "certificate" was worthless.

### Defendants' Civil RICO Violations and Piercing the Corporate Veil

108.    Over the past 10 years, Defendants have engaged in an ongoing pattern of racketeering activity by and through their fictitious criminal enterprise ICIT and the sham entity ICCI.

109.    Defendants Geeta and Chris Brown have formed an association in fact with Defendant ICIT, which operates through the sham, unauthorized company ICCI.

110.    Defendants' pattern of criminal activity involves several RICO predicate acts under 18 U.S.C. § 1961(1)(B), each of which impacted and were conducted via interstate commerce.

111.    Defendants committed the RICO predicate act of extortionate credit transactions under 18 U.S.C. §§ 891-894, by threatening to harm Plaintiffs' property (including their finances, ability to earn a living, and credit history) and resorting to illegal/criminal means to accomplish the fraudulent credit transactions associated with ICCI tuition, which were undertaken solely for Defendants' own personal, fraudulent financial gain.

112.    Defendants committed the RICO predicate act of mail fraud under 18 U.S.C. § 1341 by developing and perpetuating a scheme to defraud students and the U.S. Government of at least $90 million dollars between 2011 and 2017. Defendants used the mail in furtherance of their fraudulent scheme on an ongoing, daily basis for years. Defendants' mail fraud continued well into 2016 when Plaintiffs finally received their transcripts from ICCI.

113.    Defendants repeatedly committed the RICO predicate act of financial institution fraud under 18 U.S.C. § 1344 in connection with Federal financial aid programs under Title IV, including the Direct Loan and Pell Grant Programs, as well as Stafford Loans.

114.    Defendants committed the RICO predicate act of money laundering under 18 U.S.C. § 1957 by knowingly retaining and laundering funds that were obtained through defrauding students like Plaintiffs, as well as the U.S. Government.

115.    Upon information and belief, some of the proceeds of Defendants' illegal fraud have been laundered through other sham business entities like Prestige Talent Agency and CNC Entertainment, among others, in violation of 18 U.S.C. § 1957.

116.    For Plaintiff Katherine Perez, an additional RICO predicate act occurred in late 2015, when Defendants forced her to obtain an additional loan disbursement for another semester of school that was unnecessary.

117.    Defendants, who were debt collectors within the meaning of the Federal Debt Collection Practices Act (15 U.S.C. § 1692(a), ("DPCA") and the Maine Fair Debt Collection Practices Act (32 M.R.S. § 11002(6), "MFDCPA"), committed additional RICO predicate acts beginning in February of 2016 when they sought to illegally accelerate loan payments and refused to provide student transcripts that would allow Plaintiffs to take the NCLEX exam. Defendants' RICO predicate acts in accelerating loan payments violated FDCPA and the MFDCPA, 32 M.R.S. §§ 11012 and 11013.

118.    For purposes of Plaintiffs' claims, the first RICO predicate acts occurred in or about April of 2014, continued through the time that Plaintiffs completed the fraudulent ICCI LPN program, and well into 2016 when Defendants fraudulently withheld student transcripts in exchange for accelerated loan payments.

119.    Defendants attempted to collect and settle debts with Plaintiffs without providing any loan documents, despite repeated requests continuing into 2019. Therefore, the RICO predicate acts regarding illegal debt collection practices continue to this day for each of the Plaintiffs, all of whom continue to pay off student loan debt for Defendants' scam.

120.    Defendants committed ongoing RICO predicate acts in mid-2016 when Plaintiffs requested copies of the release/debt settlement agreement they signed, which Defendants refused to provide.

121.    Even if the last RICO predicate act by Defendants is considered to have occurred when each Plaintiff involuntarily signed a release agreement accelerating the repayment of their

student loans, Defendants agreed to toll the statute of limitations in this case beginning on August 9, 2019.

122.    There is an ongoing threat of criminal activity committed by Defendants because ICCI continues to operate a criminal enterprise and fraudulent scheme to defraud students as well as the U.S. government. Currently, on ICCI's website, the following certificate programs are offered: healthcare office specialist, medical assistant, pharmacy technician, dental assistant, mental health rehabilitation technician, alcohol and drug counseling studies, HVAC technician, computerized accounting, and cybersecurity specialist.

123.    Currently, ICCI's website also purports to offer an Associates of Applied Science degree in "substance use disorder" and "alcohol and drug counselor."

124.    ICCI filed an annual report in 2017 in order to receive accreditation through BPPE, the "Bureau for Private Postsecondary Education."

125.    The annual report asked ICCI to answer the following: "Has any accreditation agency taken any final disciplinary action against this institution?" Defendants falsely answered "no," despite having the Maine BON shut down their LPN program. In addition, Defendants' statement was false, fraudulent, and misleading because, upon information and belief, Defendants have been investigated by the Accrediting Council for Continuing Education and Training in California.

126.    The 2017 annual report indicated that Defendants received $10,211,691.00 in federal financial aid/Title IV funds that year alone.

127.    The 2017 annual report indicated that Defendants received $1,042,546.00 in veterans' financial aid funds that year alone.

128.    The 2017 annual report indicated that Defendants received $473,259.00 in funds from the Workforce Innovation and Opportunity Act in that year alone.

129.    According to the annual report, none of the certificate and/or degree program Defendants' purported to offer in 2017 led to an occupation that required State licensing. However, in the State of California licenses are required to become gainfully employed in many of the fields purportedly taught by Defendants, including dental assistants, HVAC technicians, alcohol and drug counselors, and others. Students attending Defendants' programs get absolutely no benefit in return for their money.

130.    A current google earth review of the various California campuses for ICCI shows that most of the buildings where ICCI purports to teach classes have no signage or other outward appearance of a legitimate office, school campus, or other educational institution.

131.    The "home office" for ICIT/ICCI is a UPS store.

132.    Based on videos posted to ICCI's YouTube channel, Defendants are now targeting veterans for sham educational programs that will offer nothing in return for their money.

133.    Plaintiffs are still paying off Federal student loan debt for Defendants' fraudulent, scam entity ICCI, which is now defunct and was never accredited.

134.    For all of the foregoing reasons, Defendants Geeta Brown and Christopher Brown have engaged in a fraudulent, criminal enterprise through their scam postsecondary educational institution. Based on Defendants' fraud, as well as the fact that the Maine LPN program of ICCI operated under a different name that was not registered or authorized to do business in the State of Maine, a sufficient basis in law and equity exists to pierce the corporate veil and hold Defendants personally liable for ICCI's wrongdoing.

## COUNT I – CIVIL RICO VIOLATION UNDER 18 U.S.C. § 1962(a)

135.    Plaintiffs repeat the allegations contained in Paragraphs 1 through 134 as if fully stated herein.

136.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the criminal enterprise and fraudulent scheme described above, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(C) ("RICO").

137.    As described in detail above, Defendants have, along with their scam entity "ICCI," engaged in repeated, related, separate, long-term instances of intentionally fraudulent, criminal conduct in violation of RICO.

138.    Defendants' criminal enterprise and fraudulent scheme described above affected interstate commerce.

139.    Defendants' criminal enterprise and fraudulent scheme described above was part of a pattern of continuous, related instances of criminal behavior that amounted to racketeering activity within the meaning of 18 U.S.C. § 1961.

140.    Defendants' racketeering activity involved numerous separate acts and transactions, each constituting a crime within the meaning of RICO, that amounted to at least 2 separate criminal acts that affected multiple parties.

141.    There is a threat of continued criminal activity on the part of the Defendants.

142.    Plaintiffs justifiably relied on fraudulent statements made by Defendants in furtherance of their scam, to Plaintiffs' detriment.

143.    Defendants have received income derived directly and/or indirectly from the above-stated pattern of racketeering activity and used the proceeds of that income in the

operation of various enterprises engaged in interstate commerce including ICIT, ICCI, and potentially other businesses such as Prestige Entertainment.

144.    Plaintiffs have suffered each suffered injury to their property, finances, credit history, and careers which have been directly caused by Defendants' racketeering activity.

145.    Specifically, Defendants' use of the proceeds of unlawful racketeering activity caused ICCI's fraudulent program to continue in existence, and the use of such funds directly harmed Plaintiffs.

146.    Because of Defendants' RICO violations, Plaintiffs are each entitled to treble damages plus attorney's fees under 18 U.S.C. § 1964.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants on their Civil RICO claims, award monetary damages, treble damages, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT II – CIVIL RICO VIOLATION UNDER 18 U.S.C. § 1962(b)

147.    Plaintiffs repeat the allegations contained in Paragraphs 1 through 146 as if fully stated herein.

148.    For all of the reasons set forth above, including the elements necessary to establish a violation of the civil RICO statute alleged in Count I, Defendants have, along with their scam entity "ICCI," and through the above-described pattern of racketeering activity, maintained an interest and control in the fraudulent enterprises ICIT and ICCI, which are engaged in interstate commerce.

149.    Plaintiffs have each suffered injury to their property, finances, credit history, and careers which have been directly caused by Defendants' racketeering activity.

26

150.     Because of Defendants' RICO violations, Plaintiffs are each entitled to treble damages plus attorney's fees under 18 U.S.C. § 1964.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants on their Civil RICO claims, award monetary damages, treble damages, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT III – CIVIL RICO VIOLATION UNDER 18 U.S.C. § 1962(c)

151.     Plaintiffs repeat the allegations contained in Paragraphs 1 through 150 as if fully stated herein.

152.     For all of the reasons set forth above, including the elements necessary to establish a violation of the civil RICO statute alleged in Count I, Defendants have, through the above-described pattern of racketeering activity, associated with an enterprise engaged in activities that affect interstate commerce.

153.     Defendants have furthermore participated in, profited from, and conducted the affairs of the criminal/fraudulent enterprises described above.

154.     Plaintiffs have each suffered injury to their property, finances, credit history, and careers which have been directly caused by Defendants' racketeering activity.

155.     Because of Defendants' RICO violations, Plaintiffs are each entitled to treble damages plus attorney's fees under 18 U.S.C. § 1964.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants on their Civil RICO claims, award monetary damages, treble damages, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT IV – CIVIL RICO CONSPIRACY UNDER 18 U.S.C. § 1962(d)

156.    Plaintiff repeats the allegations contained in Paragraphs 1 through 155 as if fully stated herein.

157.    For all of the reasons set forth above, including the elements necessary to establish a violation of the civil RICO statute alleged in Count I, Defendants have conspired to violate the provisions of 18 U.S.C. § 1962(a)-(c) through the above-described pattern of racketeering activity.

158.    Plaintiffs have each suffered injury to their property, finances, credit history, and careers which have been directly caused by Defendants' racketeering activity.

159.    Because of Defendants' RICO violations, Plaintiffs are each entitled to treble damages plus attorney's fees under 18 U.S.C. § 1964.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants on their Civil RICO claims, award monetary damages, treble damages, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT V: VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### (5 M.R.S. § 213)

160.    Plaintiffs repeat the allegations contained in Paragraphs 1 through 159 as if fully stated herein.

161.    Defendants, acting by and through their scam entity "ICCI," are sophisticated, for-profit business and lenders who regularly engage in for profit education and lending as their profession and primary source of income.

162.    Defendants' tactics of fraudulent inducement, coercion and/or duress to obtain tuition funds constituted an unfair trade practice in violation of 5 M.R.S.A. § 207.

28

163.    Defendants' tactics of fraudulent inducement, coercion, and/or duress to obtain the settlement agreements described above constituted an unfair trade practice in violation of 5 M.R.S.A. § 207.

164.    The unfair or deceptive trade practice was committed in the conduct of Defendants' trade or commerce as for-profit business professionals and/or lenders.

165.    The unfair or deceptive trade practice caused Plaintiff a financial loss.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court (1) enter judgment in favor of the Plaintiffs and (2) award damages sufficiently large to compensate for damages they have suffered as a result of Defendants' conduct including but not limited to damages for general and non-economic damages, economic damages, prejudgment and post judgment interest, lost wages, punitive damages, costs of this suit, including reasonable attorney fees and costs, injunctive relief and such further relief the Court may deem proper.

## COUNT VI: VIOLATION OF MASSACHUSETTS GENERAL LAW CHAPTER 93A

166.    Plaintiffs repeat the allegations contained in Paragraphs 1 through 165 as if fully stated herein.

167.    For all of the reasons stated above, Defendants engaged in unfair methods of competition and deceptive trade practices within the meaning of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, § 2.

168.    Defendants' deceptive trade practices occurred within 4 years of the filing of this lawsuit given Defendants' conduct in withholding transcripts in exchange for illegally accelerated loan payments, as well as withholding loan documents to this day.

169.    The unfair or deceptive trade practice caused Plaintiffs to suffer the financial losses discussed above.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court (1) enter judgment in favor of the Plaintiffs and (2) award damages sufficiently large to compensate for damages they have suffered as a result of Defendants' conduct including but not limited to damages for general and non-economic damages, economic damages, prejudgment and post judgment interest, lost wages, punitive damages, costs of this suit, including reasonable attorney fees and costs, injunctive relief and such further relief the Court may deem proper.

## COUNT VII: FRAUD

170.    Plaintiffs repeat the allegations contained in Paragraphs 1 through 169 of their Complaint as if fully set forth herein.

171.    As described above, Defendants, acting by and through their scam entity "ICCI," knowingly made multiple fraudulent misrepresentations to Plaintiffs to induce them to take out student loans for a scam LPN program.

172.    The quality of the nursing program, its accreditation, and the entire fraudulent scheme advanced by Defendants, as well as the terms of the loans they induced Plaintiffs to take out, were material facts relied on by Plaintiffs.

173.    Defendants intentionally or recklessly failed to communicate accurate information about the quality of the nursing program and the terms of the educational loans it provided.

174.    Plaintiffs justifiably relied on Defendants' misrepresentations regarding the quality of the nursing program and the terms of the educational loans as true and acted upon the misrepresentations in deciding to attend ICCI to their detriment.

175.    In addition, Plaintiffs justifiably relied on Defendants' fraudulent misrepresentations regarding the need to accelerate their loan payments in order to obtain their transcripts and take the NCLEX exam.

176.    Due to Defendant's fraudulent inducement, the contracts between Plaintiffs and Defendants, including any applicable arbitration provisions, must be rescinded.

177.    Plaintiffs specifically demand the equitable remedy of rescission of the entire contract between them and Defendants, including without limitation any provision requiring arbitration of claims against ICCI, which is not a party to this action.

178.    Due to Defendants' fraudulent inducement, any contractual obligation to repay loans was null and void at the time Defendants' demanded accelerated repayment from Plaintiffs.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants for fraud, and award monetary damages, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate, including equitable remedies such as rescission.

## COUNT VIII: NEGLIGENT MISREPRESENTATION

179.    Plaintiffs repeat the allegations contained in Paragraphs 1 through 178 of their Complaint as if fully set forth herein.

180.    Defendants, acting through their scam entity "ICCI," had a pecuniary interest in signing each of the Plaintiffs up for enrollment, and the resulting tuition, for ICCI's unaccredited LPN program.

181.    Defendants supplied each of the Plaintiffs with false and inaccurate information about the LPN program as well as its accreditation or even candidacy for accreditation at every step in the relationship between the parties, as described above.

182.    Defendants failed to exercise reasonable care about the quality of ICCI's programs, whether it was capable of attaining accreditation of the LPN program, and the corporate formalities regarding who actually owned and operated ICCI.

183.     Plaintiffs justifiably relied on Defendants' negligent misrepresents described above to their financial detriment.

184.     Defendants' negligent misrepresentations, upon which Plaintiffs' relied to their detriment, caused Plaintiffs to suffer financial and economic harm as discussed above.

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants for negligence and negligent misrepresentation, and award monetary damages, attorney's fees and costs of suit, plus interest, and such other and further relief as this Court deems just and appropriate.

## COUNT IX: BREACH OF CONTRACT

185.     Plaintiffs repeat the allegations contained in Paragraphs 1 through 184 of their Complaint as if fully set forth herein.

186.     In 2014, 2015 and 2016, Plaintiffs entered into various agreements with Defendants, acting by and through their scam entity or entities ICCI, in exchange for certain promises made by Defendants regarding the quality of their nursing program.

187.     Defendants claimed that the agreements signed by Plaintiffs were supported by adequate consideration and a mutual intent to be bound.

188.     In the end, Plaintiffs received no consideration for the various contracts they entered into with Defendants.

189.     The contracts between the parties were procured by fraud and therefore subject to the equitable remedy of rescission. Alternatively, Defendants are liable to Plaintiffs for breach of contract and all consequential damages resulting therefrom.

WHEREFORE, Plaintiffs request that the Court award them damages for Defendants' breach of contract, attorney's fees, costs and expenses, interest, equitable and injunctive relief, and all other relief afforded to them by law.

## JURY TRIAL DEMAND

Plaintiffs Mariana Acosta, Katherine Perez, and Marleny Polanco hereby demand a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.


Dated:   April 21, 2020

/s/ *Danielle Quinlan*

_____

Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
dquinlan@whiteandquinlan.com


/s/ *Laura H. White*

_____

Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
lwhite@whiteandquinlan.com